885 F.2d 185
 132 L.R.R.M. (BNA) 2547
 NAVY CHARLESTON NAVAL SHIPYARD, CHARLESTON, SOUTH CAROLINA, Petitioner,
v.
FEDERAL LABOR RELATIONS AUTHORITY, Respondent
and
Federal Employees Metal Trades Council of Charleston, Intervenor.
 No. 88-2131.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 8, 1989.
Decided Sept. 14, 1989.
 
 Robert K. Rasmussen (William Kanter, Appellate Staff, Civ. Div., Dept. of Justice, John R. Bolton, Asst. Atty. Gen., on brief), for petitioner.
 Robert J. Englehart (William E. Persina, Acting Sol., Federal Labor Relations Authority, on brief), for respondent.
 (Sally M. Tedrow, Nicholas R. Femia, O'Donoghue & O'Donoghue, on brief), for intervenor.
 Before ERVIN, Chief Judge, CHAPMAN, Circuit Judge, and TILLEY, United States District Judge for the Middle District of North Carolina, sitting by designation.
 ERVIN, Chief Judge:
 
 
 1
 The Charleston Naval Shipyard ("the Shipyard") petitions for review of an order of the Federal Labor Relations Authority ("FLRA") ordering the Shipyard to negotiate over an employee bonus incentive program proposed by the Federal Metal Trades Council of Charleston ("the Council"). The Shipyard argues that negotiating over the proposal would interfere with its prerogative to determine its own budget as provided for by the Federal Service Labor-Management Relations Act (Title VII of the Civil Service Reform Act of 1978), 5 U.S.C. Secs. 7101-35 ("the Act"). We agree and decline to enforce the FLRA's order.
 
 I.
 
 2
 The facts of this case are straightforward and not in dispute. The Shipyard is among a unique breed of Department of Defense operations known as "industrially funded activities." Much like a commercial shipyard, the Shipyard submits bids in competition with private contractors to do maintenance work for its "customer," the Navy. A significant portion of the Shipyard's operating revenues come from the proceeds of contracts it successfully bids for, including whatever "profit" it makes. The Shipyard recently received a contract to refurbish two of the Navy's ballistic missile submarines, the U.S.S. Benjamin Franklin and the U.S.S. George Bancroft. In the hopes of minimizing costs and time required to complete the project, the Shipyard announced a profit-sharing plan under which employees would receive 50% of the profits from the contract. The remaining 50% would be used to fund the Shipyard's ongoing capital expenditures.
 
 
 3
 The Council, an association of unions which represent many of the Shipyard's employees, sought to negotiate over how these profits would be spent. The Council proposed that the shipyard allocate 80% of the profits to employee incentive bonuses, 10% to employee development, and 10% to capital expenditures for the shipyard's plant and equipment. The Shipyard refused to negotiate over the Council's proposal, asserting that, among other reasons, the proposal interfered with its budgetary prerogatives.
 
 
 4
 The Council then filed a negotiability appeal with the FLRA. See 5 U.S.C. Sec. 7105(a)(2)(E). In May of 1988, the FLRA ruled that the Council's proposal was negotiable. Federal Employees Metal Trades Union Council of Charleston, 32 FLRA No. 15 (1988). The Shipyard now appeals the FLRA's decision that the proposal did not interfere with the Shipyard's prerogative to establish its own budget.[1]II.
 
 
 5
 The Act grants federal employees the right "to engage in collective bargaining with respect to conditions of employment." 5 U.S.C. Sec. 7102(2). While the Act imposes upon federal executive agencies a general duty to bargain in good faith with employee representatives, 5 U.S.C. Secs. 7114(a)(4), 7117, the Act excludes a number of important subjects from the realm of negotiation. Among these subjects are several "management rights," specified in Sec. 7106, including management's responsibility "to determine the mission, budget, organization, number of employees, and internal security practices of the agency." 5 U.S.C. Sec. 7106(a)(1). "Congress enacted the management rights clause to ensure that the collective bargaining system in [the Act] would not undermine the effectiveness of government through unwarranted intrusion on management prerogatives." United States Department of Health and Human Services v. F.L.R.A., 844 F.2d 1087, 1090 (4th Cir.1988). Section 7106 thus "cordons off an area of management prerogative which Congress thought must be immune from the pressures of bargaining if government managers were to direct public agencies and conduct public business in the manner the public expects." Id., at 1091-92. Union bargaining proposals which interfere with these prerogatives are nonnegotiable.
 
 
 6
 The Act confers upon the FLRA the responsibility for determining, in the first instance, whether union proposals are negotiable. Library of Congress v. F.L.R.A., 699 F.2d 1280, 1285. (DC Cir.1983). The FLRA's determinations are, of course, "entitled to considerable deference when it exercises its 'special function of applying the general provisions of the Act to the complexities' of federal labor relations." Bureau of Alcohol, Tobacco & Firearms v. F.L.R.A., 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983), quoting NLRB v. Erie Resistor Corp., 373 U.S. 221, 236, 83 S.Ct. 1139, 1149, 10 L.Ed.2d 308 (1963). To the extent that such determinations involve interpretation of the Act's provisions, those determinations will not be disturbed on appeal unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Secs. 706(2)(A), 7123(c); Department of Health and Human Services, 844 F.2d, at 1090.
 
 
 7
 The FLRA determines the negotiability of proposals that allegedly interfere with management's budgetary prerogative according to a two prong test set forth in AFGE and Air Force Logistics Command, Wright-Patterson Air Force Base, 2 FLRA 604 (1980) ("Wright-Patterson"). Under Wright-Patterson, a proposal is nonnegotiable pursuant to Sec. 7106(a)(1) if it (1) "attempt[s] to prescribe the particular programs or operations the agency would include in its budget or to prescribe the amount to be allocated in the budget for them" or (2) involves "an increase in costs [that] is significant and is not offset by compensating benefits." Id., at 607-608. Here, the FLRA reasoned that since the exact amount of the Shipyard's profits from the submarine repair project was as yet only speculative and since the proposal concerned only the percentage distribution of the profits, the Council's proposal did not prescribe a particular amount to be allocated for the incentive program. Thus the FLRA concluded that the proposal did not run afoul of the first prong of the Wright-Patterson test.[2]
 
 
 8
 We cannot accept the FLRA's reasoning. Neither the fact that profits were uncertain prior to actual completion of the project or the fact that the Council's proposal was phrased in terms of percentages rather than real dollar amounts lessens the proposal's impact on the Shipyard's budgetary prerogative. In Nuclear Regulatory Commission v. FLRA, 879 F.2d 1225 (4th Cir.1989) (en banc), we reviewed a union proposal similar to the proposal at issue here. The National Treasury Employees Union, collective bargaining agent for most of the NRC's employees, sought to bargain over a proposal to annually adjust salaries according to the recommendations of the President's Advisory Committee on Federal Pay. Under the proposal, these adjustments would be implemented for the NRC's employees regardless of whether the President or Congress adopted the Committee's recommendations. In declining to enforce the FLRA's bargaining order, we stated:
 
 
 9
 the FLRA contends that the union's salary proposal does not violate the management rights clause because the proposal does not prescribe a specific dollar amount to be allocated in the NRC's budget. According to the FLRA, the union's proposal "merely establishes a formula for adjusting [employee] salaries" and is therefore within the NRC's duty to bargain. We reject this argument. Although the union's proposal does not prescribe a specific dollar amount, it does provide a formula which ultimately will dictate a specific dollar amount to be allocated in the NRC's budget each time the Advisory Committee on Federal pay [sic] recommends a cost-of-living adjustment to Congress and the President.
 
 
 10
 Nuclear Regulatory Commission v. FLRA, supra, at 1232.
 
 
 11
 The en banc court's ruling clearly controls our decision in this case. The proposal here at issue admittedly is not phrased in terms of an actual dollar amount. It does, however, specify a percentage of the Shipyard's profits to be distributed to employees. Once those profits become certain, the Council's proposal will "ultimately dictate a specific dollar amount." Union proposals, no matter how artfully crafted to avoid specifying dollar amounts today, nonetheless run afoul of the Wright-Patterson test if, once adopted and implemented, such proposals will have the effect of prescribing the use of agency funds in the future. Even though the dollar figures which would have to be allocated under the Council's proposal are as yet unknown, the proposal completely divests Shipyard managers of discretion and control over the allocation of the profits to be realized. It is this discretion and control over an agency's funding decisions that Congress expressly reserved to managers in Sec. 7106(a)(1). See Nuclear Regulatory Commission v. FLRA, supra, at 1232.
 
 III.
 
 12
 Because the Council's proposal will have the ultimate effect of eliminating the Shipyard's control over how to allocate its profits, the proposal interferes with the Shipyard's prerogative to determine its budget. We grant the Shipyard's petition for review, reverse the decision of the FLRA, and deny enforcement of the FLRA's bargaining order.
 
 
 13
 ENFORCEMENT DENIED.
 
 
 
 [1]
 In the negotiability proceedings before the FLRA, the Shipyard also asserted that the proposal (1) violated sovereign immunity, (2) did not concern a condition of employment, (3) was inconsistent with federal law, and (4) would interfere with the agency's prerogative to determine methods and means of performing work. The Shipyard does not appeal from the FLRA's rejection of these contentions
 
 
 [2]
 The FLRA also found that the Shipyard did not present sufficient evidence to show that the proposal failed under the cost-benefit analysis required under prong two. Since we conclude that the proposal does indeed prescribe a specific amount to be allocated in the Shipyard's budget, and therefore violates prong one, we need not address the FLRA's conclusions respecting prong two